Faisal Gill
Gill Law Firm
1717 Pennsylvania Avenue
Suite 1025
Washington. DC 20006
310-418-6675
202-318-5331 (fax)
Fgill@glawoffice.com

Receipt number AUSFCC-6550156

## IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

| | | | |
|---|---|---|---|
| VARDA KHALIL | ) | | |
| | ) | | |
| | ) | | |
| Plaintiff | ) | COMPLAINT | 20-1467 C |
| | ) | | |
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| Defendant | ) | | |

### NATURE OF ACTION

1. This action is brought for wrongful termination and violation of the Administrative Procedures Act, whereby Defendant, through USAGM and its CEO, Michael Pack, investigated and terminated Ms. Khalil from her personal services contract for Voice of America in violation of the statutory firewall protections set in place by the United States International Broadcasting Act.

### PARTIES

2. Varda Khalil is an individual resident of the Commonwealth of Virginia.

3. U.S. Agency for Global Media ("USAGM") is a federal government agency that oversees all non-military, U.S. international broadcasting, and is funded by the U.S. Congress.

1

4. Michael Pack is the Chief Executive Officer and Director of the U.S. Agency for Global Media.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491.

## FACTUAL BACKGROUND

BACKGROUND OF U.S. AGENCY FOR GLOBAL MEDIA AND VOICE OF AMERICA

6. Voice of America ("VOA") is part of the U.S. Agency for Global Media ("USAGM").

7. VOA is the largest U.S. international broadcaster, providing news and information in more than 40 languages to an estimated weekly audience of more than 280 million people.

8. VOA's mission is to promote the free flow of information worldwide, especially in countries where authorities restrict freedom of expression.

9. VOA's Urdu service provides a wide variety of programs on multiple platforms and is a reliable source of news and information in Pakistan and the diaspora. Its target audience is Pakistan, including FATA, Pakistani diaspora in the Middle East, Europe, and Urdu-speaking population in India and around the world. Their aim is to cover topics about the United States that are relevant and relatable to their target audience.

10. To ensure the integrity and credibility of this vital work, their independence from political interference is protected by a strict "firewall" embodied in statutes, regulations, and binding contract provisions.

11. Congress passed the United States International Broadcasting Act (hereinafter "the Act"), Pub. L. No. 103-236, 108 Stat. 432 (Apr. 30, 1994). The Act "reorganiz[ed] and consolidat[ed]" United States international broadcasting in order to "strengthen the

2

capability of the United States to use broadcasting to support freedom and democracy in a rapidly changing international environment." 22 U.S.C. § 6201(5).

12. The Act establishes a statutory firewall between the Executive Branch and grantees. The firewall ensures that grantees enjoy full editorial independence under the Act by requiring the Executive Branch to "respect the professional independence and integrity of the Board, its broadcasting services, and [its] grantees." 22 U.S.C. § 6204(b).

13. Because of this firewall, agency networks—and their employees—are "fully insulated" from any "political . . . pressures or processes" that would "be inconsistent with the highest standards of professional journalism." Firewall and Highest Standards of Professional Journalism, 85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. § 531).

14. That independence furthers the Agency's mission of providing "a balanced and comprehensive projection of United States thought and institutions" that "reflect[s] the diversity of United States culture and society." 22 U.S.C. § 6202(b)(2).

15. This "firewall" is violated when "any person within the Executive Branch . . . attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities." Firewall and Highest Standards of Professional Journalism, 85 Fed. Reg. 36,150, 36,152 (June 11, 2020) (to be codified at 22 C.F.R. § 531.3).

16. Under the Act, the CEO of USAGM must honor the independence and integrity of VOA. The CEO has a set of limited powers, enumerated in 22 U.S.C. § 6204, to oversee the

activities of VOA. But the Act is clear: International broadcasting services and other grantees—even those that report to the CEO—are fundamentally private entities. Nothing in the Act "may be construed to make . . . any . . . entity provided funding by the agency a Federal agency or instrumentality." 22 U.S.C. § 6209(c).

### APPOINTMENT OF MICHAEL PACK AS CEO OF USAGM

17. In 2018, at the urging of Steve Bannon, President Trump nominated Michael Pack for the position of CEO of the U.S. Agency of Global Media.

18. Beginning in early 2020, President Trump publicly attacked VOA's coverage, calling it "disgusting" after he disagreed with their story about the lifting of the lockdown in the Chinese city of Wuhan, where the new coronavirus first emerged.

19. His administration took similar action against VOA, including a White House official accusing VOA of carrying "propaganda" for China and Iran, and Mike Pence threatening to ban a VOA reporter from his plane after the reporter questioned the claim that Pence didn't know he was breaking the rules when he failed to wear a mask at the Mayo Clinic.

20. In June 2020, President Donald Trump persuaded senators to confirm Pack as the head of USAGM despite serious concerns from numerous leaders.

21. He is a close ally of Steve Bannon—the former Breitbart publisher—who Mr. Pack describes as his "mentor" and who recommended Mr. Pack for the post. When questioned about Pack and his potential appointment, Bannon stated "He's my guy, and I pushed him hard."

22. Almost immediately upon his arrival, Mr. Pack implemented a freeze on contracts and terminated long time board members that had been part of USAGM for years, including

4

those on the boards of Radio Free Europe/ Radio Liberty, Radio Free Asia and the Open Technology Fund, many of whom filed a Whistleblower Complaint against Pack.

23. Mr. Pack then placed loyal Trump Administration officials to key roles within USAGM, including Michael Williams, former Deputy Assistant to the President and associate general counsel of Trump's inaugural committee, and Jonathan Bronitsky, former chief speechwriter at the U.S. Department of Justice who also held a similar role at the Claremont Institute, a conservative think tank that was once led by Pack himself.

24. Mr. Pack then took it upon himself to have his office investigate VOA employee and staff for "potential violations of the VOA Charter".

## NATURE OF MS. KHALIL'S EMPLOYMENT

25. Varda Khalil has been an employee of VOA since 2013, specifically working for the VOA Urdu Service.

26. Ms. Khalil was hired under a "personal service contract."

27. During the entirety of her employment, Ms. Khalil was expected to work 40 hours per week, worked from the Voice of America headquarters, and was directed and supervised by Voice of America employees at all times. Further, Ms. Khalil received healthcare benefits through her employment, paid time off, and received a W2, as USAGM paid applicable income taxes and social security taxes.

28. As part of her employment, Ms. Khalil received a "Personal Services Contractor Handbook" (hereinafter the "Handbook") which was incorporated as part of her employment contract.

29. Article 1 of the Handbook states that a "personal services contract", "[c]onsistent with the definition in FAR 2.101, refers to a contract that, by its express terms or as administered, makes the contractor personnel appear to be, in effect, Government employees."

30. During her employment with VOA, Ms. Khalil held many different positions with the agency, working in television, radio, and social media broadcasting.

31. Ms. Khalil was an exemplary employee, receiving high scores in her reviews and never receiving negative responses for her work until the story at issue in this matter.

32. As of July 2019, Ms. Khalil worked under the Social Media team of VOA Urdu, with the title "International Multimedia Journalist Level III – FT".

33. Ms. Khalil conducted her work under the direct supervision of multiple individuals at VOA, including her direct supervisor, the Content Editor, and the Social Media Lead.

34. Upon taking her role as the International Medial Journalist in July 2019, Ms. Khalil was provided a typical workflow desired by VOA by her service chief.

35. Ms. Khalil followed this workflow in providing content for VOA Urdu publication.

36. Specifically, the workflow was comprised of the following steps:

    a.  First, Ms. Khalil was tasked to search news wires for relevant stories.

    b.  She would then provide a list of potential stories to her direct supervisor during their morning meeting. Her direct supervisor would then either approve or deny the story idea.

    c.  Once the story idea was approved by her direct supervisor, Ms. Khalil would put together the story, translating the story from English to Urdu.

6

d.  Ms. Khalil would then send the proposed script, along with sources and news links to her direct supervisor, the Content Editor, and the Social Media Lead.

e.  Once Ms. Khalil would receive the edited and approved script from her supervisors, she would then edit visuals for the story and send to the Social Media team for review and approval before they post the story online.

f.  Ms. Khalil never posts content online herself.

g.  Ms. Khalil does not have the final say about the topic of a story, the content of a story, nor the visuals used for the story.

## STORY AT ISSUE

37.  On Tuesday, July 21, 2020, Ms. Khalil followed the same procedure as explained above when she became aware that Joe Biden had addressed the Emgage Action online summit for Million Muslim Votes.

38. Ms. Khalil was aware that VOA had written stories similar to this nature before.

39. First, Ms. Khalil proposed the story idea, along with five other story ideas, to her direct supervisor during their morning meeting. Her direct supervisor approved the story about Joe Biden. The other stories were not approved.

40. Ms. Khalil then put together the story script, with Urdu translation, and provided it to her direct supervisor, Content Editor, and Social Media Lead, via email with the subject line "Please Edit".

41. Ms. Khalil stated facts straight from the news wire. She did not interject her own personal judgment, opinion or beliefs in the story.

42. The story was specifically about the online summit for Million Muslim Votes and related actions by Emgage Action.

43. Neither President Trump nor anyone from his administration provided any address to the summit.

44. In fact, President Trump's only action related to Vice President Joe Biden's address to Emgage Action's summit was to retweet Paul Sperry's comment on the address.

45. According to Georgetown University's Bridge Initiative, Sperry has blamed Islam for the spread of the Ebola virus, called former President Barack Obama the "defender-in-chief of Islam," warned of an "Islamic fifth column" growing inside America, accused tax reform activist Grover Norquist of "ties to militant Muslim activists," and written multiple debunked books attacking Islam and Muslims.

46. In her email to her supervisors, Ms. Khalil proposed the following content to be posted through VOA Urdu:

> Joe Biden, the presumptive Democratic presidential nominee, got support from Muslim Americans during an online summit Monday.
> "We all come from the same root here in terms of our fundamental basic beliefs. And I just want to thank you for giving me the opportunity, for being engaged, for committing to action this November," said Biden from his home in Wilmington, Delaware.
> "You're doing what's been, that's never been done before. You're registering and turning out one million Muslim voters this November. It matters. Your voice. Your voice is your vote. Your vote is your voice. Muslim American voices matter."
> The support came during Emgage Action's online summit called "Million Muslim Votes," underscoring its emphasis on boosting Muslim turnout in November.
> This comes as several prominent Muslim American elected officials endorsed Biden for president in a letter organized by Emgage Action ahead of the summit.

> Among those signing the letter, obtained by Associated Press, were Minnesota Rep. Ilhan Omar, Minnesota Attorney General Keith Ellison and Indiana Rep. Andre Carson, all Democrats.
>
> Omar, one of the first Muslim women elected to Congress, served as a high-profile surrogate for Bernie Sanders before he exited the presidential race in April – making her support for Biden potentially helpful as the former vice president seeks to mobilize Muslim voters this fall.
>
> The pro-Biden letter from Muslim American elected officials decried a number of President Donald Trump's domestic and international policies, including his administration's ban on travelers from several predominantly Muslim countries and his pullout from the Iran nuclear deal.
>
> The Muslim American officials also praised Biden's agenda for their communities. Among other goals, Biden has vowed to rescind the Trump administration's travel ban affecting Muslims "on day one" if he's elected.

47. The majority of the story was produced straight from the news wire with a small contribution from Emgage Action's launch video.

48. Once her story script was approved, Ms. Khalil then edited visual content for the story, adding clips from Biden's virtual address at the summit and clips from Emgage Action's launch video for the "Million Muslim Votes" campaign, which showcased some of the listed elected officials who endorsed Biden as stated in the story.

49. Ms. Khalil specifically did not include clips from Biden's address or from Emgage Action's launch video that made direct attacks at President Trump or the current administration.

50. Upon sending her initial proposal for the video that would coincide with her proposed story, Ms. Khalil's Social Media Lead supervisor requested that Ms. Khalil add video footage of Biden quoting from the Hadith, a collection of the traditions or sayings from the Prophet Muhammad.

51. At her supervisor's direction, Ms. Khalil edited the video to include such footage.

52. The edited story and video were then sent to the Social Media Lead supervisor, who directed other members of the social media team to publish the story on various social media platforms.

53. The edited story and video were published to VOA Urdu on July 22, 2020 through Facebook, Instagram, and Twitter.

54. At no point did Ms. Khalil create a story script or video footage that was either not approved by her supervisors or was not at their direction.

55. Ms. Khalil did not publish the story herself. It was published by the Social Media team once all required approvals were given.

USAGM'S SUBSEQUENT DISCIPLINARY ACTION

56. On July 27, 2020, almost an entire week after the story was published, Ms. Khalil started to receive calls from her service chief, inquiring about the sources she used and the process she followed to create the story.

57. Ms. Khalil never received a disciplinary warning or similar statement from her supervisors regarding the story.

58. Ms. Khalil was then asked to attend a meeting with Rebecca McMenamin, the Supervisory International Broadcaster for the South and Central Asia Division, and James McLaren, Associate General Counsel for Operations from the Office of the General Counsel, on Wednesday, July 29, 2020, but the meeting was cancelled shortly after.

59. Subsequently, on July 29, 2020, Ms. Khalil received an email from Sam Dewey, an attorney personally hired by Mr. Michael Pack, the CEO of USAGM, to investigate potential Anti-Trump bias in VOA.

10

60. Mr. Dewey requested that Ms. Khalil speak with him regarding the story. He did not inform Ms. Khalil that he was an attorney for the CEO at this time.

61. Ms. Khalil then attended a virtual meeting with Mr. Dewey, where he finally identified himself as counsel to the CEO once the meeting started.

62. When Ms. Khalil inquired whether she could have an attorney present, Mr. Dewey stated he would have to get back to her, and the meeting ended.

63. Mr. Dewey later responded to her inquiry at 8:13pmEST stating that she could have a lawyer present, but that the conversation would take place early the next morning.

64. Mr. Dewey told Ms. Khalil that CEO Pack's office was directly investigating the matter.

65. Upon information and belief, Mr. Dewey has never been a journalist or news publisher. Samuel E. Dewey is an attorney and political appointee at USAGM. Prior to joining USAGM earlier this year, Dewey worked as an attorney in the private sector and served as counsel in both Houses of Congress, where he conducted investigations for Republican members of Congress. Dewey is active on Twitter, regularly tweeting politically controversial, pro-Trump, and anti-press sentiments.

66. Upon information and belief, shortly after learning about the Biden video, Voice of America leadership started to investigate but were immediately rebuffed by USAGM leadership – specifically CEO Pack's office.

67. Voice of America leadership was advised by USAGM leadership that only Mr. Dewey—a political appointee at USAGM—would be conducting the investigation into whether the Urdu service journalists abided by journalistic standards.

11

68. CEO Pack himself personally assigned Dewey to conduct this investigation, bypassing journalistic leadership.

69. In conducting the investigation, Dewey interviewed the reporters about an editorial decision in the newsroom—a blatant violation of the firewall.

70. On July 30, 2020, CEO Pack's office publicly announced that they were investigating the "VOA content that transgressed the VOA Charter, VOA's Best Practices Guide, VOA's Journalistic Code, and agency standards and principles, and, further, might have constituted U.S. election interference and a violation of federal law."

71. The announcement went on to say that the content could "only be described as an apparent election advertisement for presumptive Democratic presidential nominee and former Vice President Joe Biden."

72. Then, on July 31, 2020, Ms. Khalil received a Suspension Notice from J.R. Hill, the Branch Chief/Contracting Officer with USAGM with whom she had no prior contact with regarding this issue, stating that she was put on suspension without pay while USAGM looked into the matter of the story that was posted on July 22, 2020 violated VOA policies and whether corrective action would be taken.

73. Then, on August 11, 2020, Ms. Khalil received a Show Cause Notice from Mr. Hill, stating to Ms. Khalil that it was USAGM's intent to terminate her and that she had one week to provide them good cause as to why that should not happen.

74. The Show Cause Notice provided Ms. Khalil with the following reasons for her potential termination:

> Specifically the story violated standards as follows:
> -It included a partisan exhortation, givingthe appearance of partisanship;

12

-The video should have corrected a misstatement by Senator Biden on "the Muslim Ban," failing thereby to accurately present the story;

-You used the VOA logo at the end of the campaign video creating the appearance that VOA was part of the ad, thereby giving the appearance of partisanship;

-The video did not mention the Trump campaign's outreach efforts to Muslim voters. This should have been added for context and this omission was a failure to provide balance; and

-The story singled out organizations supporting Senator Biden's candidacy without balance or statements about those supporting the other candidate.

75. Further, the Show Cause Notice stated that the story violated the VOA Journalistic Code, VOA Best Practices, and the VOA Charter.

76. Ms. Khalil responded timely with her explanation, showing good cause as to why she should not be terminated.

77. Despite Ms. Khalil's response, on August 25, 2020, USAGM terminated Ms. Khalil of her position at Voice of America.

78. Upon information and belief, Mr. Pack and his personal team made all decisions of investigating and terminating Ms. Khalil.

79. Upon information and belief, contractors and employees of USAGM for other departments of VOA have published extremely partisan stories or social media posts without any negative action taken against them.

80. These include, but are not limited to, a Voz de America tweet, dated August 17, 2020, which promoted Mercedes Schlapp's response to the first night of the Democratic convention.

## COUNT I
## WRONGFUL TERMINATION

13

81. Plaintiff reiterates and realleges each and every allegation in Paragraphs 1-80 as if set forth fully herein.

82. On August 25, 2020, USAGM terminated Ms. Khalil's contract with the Voice of America.

83. This termination was the decision of Mr. Pack, a political appointee of President Trump.

84. Mr. Pack terminated Ms. Khalil's contract because he believed her content to be biased against President Trump.

85. Mr. Pack's investigation of Ms. Khalil was a serious breach of the legislative protections given to Voice of America through the statutory firewall which was implemented to protect the broadcaster's editorial independence and integrity.

86. Mr. Pack's termination of Ms. Khalil's contract was an egregious breach of the firewall.

87. Thus, as Mr. Pack's actions to personally make decisions of the day to day operations of Voice of America, this was a violation of law and against public policy.

88. Thus, USAGM wrongfully terminated Ms. Khalil.

89. As a result, Ms. Khalil suffered numerous damages to be determined at trial.

### COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

90. Plaintiff reiterates and realleges each and every allegation in Paragraphs 1-89 as if set forth fully herein.

91. The Administrative Procedure Act (APA) provides that a reviewing court may set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

92. Mr. Pack's investigation of Ms. Khalil was a serious breach of the legislative protections given to Voice of America through the statutory firewall which was implemented to protect the broadcaster's editorial independence and integrity.

93. Mr. Pack's termination of Ms. Khalil's contract was an egregious breach of the firewall.

94. As a result, Ms. Khalil suffered numerous damages to be determined at trial.

## CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that this Court:

1. Award Plaintiff any and all financial, economic and compensatory damages entitled to by law on each of Counts I and II; in addition

2.  Award Plaintiff other monetary damages that they may be entitled to under the law; in addition

3. Award appropriate pre-judgment and post judgment interest; in addition

4. Award expert fees and attorney's fees and cost of this action as may be permitted by law; in addition

5. Award any other relief the Court deems just and appropriate.

Respectfully Submitted,

/S/ FAISAL GILL_____
Faisal Gill

15